**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone:  (619) 237-3490
Fiske@GomezTrialAttorneys.com

**BARON & BUDD, P.C.**
Scott Summy (admitted *Pro Hac Vice*)
(Texas Bar No. 19507500)
Carla Burke (admitted *Pro Hac Vice*)
(Texas Bar No. 24012490)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: 214-521-3605

Attorneys for Plaintiffs

# UNITED STATE DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE TRUJILLO, as Guardian Ad Litem for KADEN PORTER, a minor, on behalf of himself and others similarly situated; LACEY MORALES, as Guardian Ad Litem for ISABEL MORALES., a minor, on behalf of herself and others similarly situated; BEVERLY HOY, on behalf of herself and all others similarly situated;<br><br>     Plaintiff,<br><br>   v.<br><br>AMETEK, INC., a Delaware corporation; SENIOR OPERATIONS, LLC, a limited liability company; and DOES 1 through 100, inclusive,<br><br>     Defendants. | Case No.: 3:15-cv-01394-GPC-BGS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1. **Negligence**<br>2. **Gross Negligence**<br>3. **Public Nuisance**<br>4. **Strict Liability- Ultrahazardous Activity**<br><br>**DEMAND FOR A JURY TRIAL** |

Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based on information and belief:

## INTRODUCTION

**A. Magnolia Elementary School Shut Down**

1.     On June 1, 2015, the Board of Governors of the Cajon Valley Union School District voted unanimously to close Magnolia Elementary School for the 2015-2016 school year because the indoor air was contaminated with toxic chemicals coming into the school as vapor from underlying groundwater contamination caused by Defendants' dumping and failing to clean up chemicals on adjacent property.

2.     The groundwater contamination includes chemicals such as TCE (Trichloroethylene), PCE (Tetrachloroethylene), and other chlorinated solvents.  The contamination is causing documented indoor air intrusion inside elementary classrooms.

3.     The school closure requires relocating hundreds of students and dozens of teachers to Bostonia Elementary. Magnolia Elementary is in a low income community.

4.     For decades, the Defendant manufacturing companies, Ametek, Inc. and Senior Operations, LLC, have willfully ignored a serious health and safety threat to very young children and teachers, many of whom are of child-bearing age, by dumping, failing to clean up, and continuing to allow highly toxic chemicals to contaminate the groundwater beneath Magnolia Elementary School.

5.     Children under the age of ten and pregnant women are particularly vulnerable and susceptible to toxic vapors, especially when enclosed in classrooms for several hours every weekday and for several consecutive months and years.

6.     Defendants' active dumping and continued contamination is wanton, reckless, and rife with cold corporate cost calculations, warranting punitive and exemplary damages.

7.     In continuing to dump chemicals improperly and failing to clean up, Defendants made calculated business decisions, ignored the endangerment of school children and teachers, and actively avoided compliance with regulatory orders to

identify the size and scope of the contamination.

8.     Based on current data from Ametek, Inc.'s own consultants, it appears an active source of "free product" continues to contaminate the groundwater and soil underneath Magnolia Elementary School and will do so for decades if not centuries if nothing is done to address the situation.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction based on diversity of the parties. Defendant Ametek, Inc. is a Delaware corporation with its principal place of business in Pennsylvania. Defendant Senior Operations, LLC is a Delaware limited liability company with its principal place of business in Illinois.

10.     This Court has personal jurisdiction over the Defendants because Defendants do business in California, Defendants have minimum contacts in California, and otherwise purposefully avail themselves of the markets in this state through the research, development, manufacture, promotion, advertising, sale, and marketing of products and services in California, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     This Court has jurisdiction because Defendants have or have had their principal place of business in El Cajon, California.

12.     Venue is further proper in this Court in that the subject acts and transactions giving rise to this action occurred in the County of San Diego for the following reasons:

a.     Defendants conduct business in the County of San Diego and have intentionally availed themselves of the laws and markets within San Diego County by owning and operating, or having owned and operated, the subject aerospace plant which is the source of the subject contamination;

b.     Defendants do substantial business within the County of San Diego still;

CLASS ACTION COMPLAINT

GOMEZ TRIAL
ATTORNEYS

c. Defendants are subject to personal jurisdiction in the County of San Diego; and

d. The injury and harm to Plaintiffs, as San Diego County residents, occurred within the County of San Diego in the City of El Cajon.

## **PARTIES**

13. Plaintiff Danielle Trujillo is a citizen of the State of California and a resident of the County of San Diego. Danielle Trujillo's minor son, Kaden Porter, age 7, attended Magnolia Elementary School from 2012 to October 2014. Plaintiff Danielle Trujillo brings each and every allegation as Guardian Ad Litem for her minor son, Kaden Porter.

14. Plaintiff Lacey Morales is a citizen of the State of California and a resident of the County of San Diego. Lacey Morales' daughter, Isabel Morales, age 8, has attended Magnolia Elementary School from 2013 to present. Plaintiff Lacey Morales brings each and every allegation as Guardian Ad Litem for her minor daughter, Isabel Morales.

15. Plaintiff Beverly Hoy is a citizen of the State of California and a resident of the County of San Diego. Beverly Hoy is a teacher at Magnolia Elementary School and has been a teacher there from 2008 to present.

16. Defendant AMETEK, INC. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1100 Cassatt Road, Berwyn, Pennsylvania 19312.

17. Defendant SENIOR OPERATIONS, LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 300 East Devon Avenue, Bartlett, Illinois 60103. SENIOR OPERATIONS LLC wholly owns a division called SENIOR AEROSPACE KETEMA, which is located at 790 Greenfield Drive, El Cajon, California.

18. Unless otherwise indicated, the use of any Defendant's name in this Complaint, including "Defendants," includes all agents, employees, officers, members,

directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of the named Defendants.

19.    The true names and capacities of the Defendants named herein as Does 1 through 100, inclusive, whether individual, corporate, governmental, associate or otherwise, are unknown to Plaintiff, who therefore sues such Defendants by fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Each of the Doe Defendants is responsible in some manner, either by act or omission, strict liability, fraud, negligence or otherwise, for the occurrences herein alleged, and Plaintiff's harm was legally caused by conduct of the Doe Defendants.  Does 1 through 100, inclusive, are responsible to Plaintiff on the facts and theories herein alleged.   At all relevant times, each Defendant, including those fictitiously named, was the agent, servant, and/or employee of each of the remaining Defendants, and was acting within the course and scope of said agency and employment.  Each of the Defendants is in some manner responsible for the events and happenings to which reference is made herein, and each Defendant caused injury and damage to Plaintiff as herein alleged.  The acts of Defendants and each of them were and are the acts of the other Defendants. Defendants, and each of them, ratified, authorized, and/or approved of the acts of the other Defendants.

## FACTUAL ALLEGATIONS

### Companies' History

20.    In 1953 or 1954, the AMETEK PROPERTY was founded by California Aircraft Products on the current El Cajon, California site, at 790 Greenfield Drive, El Cajon, California 92021. In 1964, California Aircraft Products changed its name to Straza Industries, which was purchased by Defendant AMETEK in 1968.[1]

---

[1] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790 Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-201, dated September 2008.

21.     AMETEK used the AMETEK PROPERTY to manufacture aircraft engine parts from 1968 to 1988.[2]

22.     Currently, the AMETEK PROPERTY is owned by SENIOR OPERATIONS, LLC, doing business as SENIOR AEROSPACE KETEMA, which has its principal place of business at 790 Greenfield Drive, El Cajon, California 92021.[3]

23.     KETEMA is AMETEK spelled backwards.

**AMETEK Dumped Chlorinated Solvents into a Hole in the Ground**

24.     In 1963, Defendants or their predecessor company dug a hole in the ground, which was 12 feet in diameter and 10 feet deep.  This hole was used as a waste "SUMP."[4]

25.     Defendants or their predecessor company lined the walls of the SUMP with redwood planks and poured concrete at its base.  This SUMP was AMETEK'S waste storage system until 1985.[5]

26.     Between 1963 and 1985, for 22 years, Straza/AMETEK dumped up to 7,000 gallons of waste per month into this SUMP.  This dumped waste included[6]:

      a.  Spent acid and alkaline solutions

      b.  Industrial chlorinated solvents

      c.  1, 1, 1- Trichloroethane (1, 1, 1- TCA)

      d.  Trichloroethylene (TCE)

      e.  Tetrachloroethylene (PCE)

      f.  Oils

      g.  Paint thinner

---

[2] *Id.*
[3] SENIOR AEROSPACE KETEMA website, www.saketema.com/history.
[4] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790 Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-201, dated September 2008.
[5] *Id.*
[6] *Id.*

CLASS ACTION COMPLAINT

GOMEZ TRIAL
ATTORNEYS

h.  Process Sludge

27.     In 1963, Straza/AMETEK submitted a Report of Waste Discharge (ROWD) to the California Regional Water Quality Control Board in order to receive authority and permission to use the SUMP as an impervious storage vessel.  Straza/AMETEK represented to the Regional Water Quality Control Board that their waste treatment facility would "prevent filtering into native soil" in a February 7, 1963 letter.[7]

28.     Straza/AMETEK did not reveal the nature or design of the SUMP, excluding the details that the SUMP was lined with redwood planks. It was not until removal of the SUMP, decades later, that the San Diego County Department of Environmental Health discovered and photographed the redwood planks.[8]

29.     Highly acidic liquid waste, spent chlorinated solvents, and appreciable amounts of various metallic wastes breached the sump and discharged into soil surrounding the sump and into the groundwater, as Straza/AMETEK dumped the chlorinated solvent waste into the SUMP until 1985.[9]

30.     Between 1963 and at least 1985, the strong, acidic liquid waste deteriorated the SUMP allowing the chlorinated solvent waste to seep and percolate into the surrounding soil, fractures in the granite rock, and into the groundwater.[10]

31.     In 1987, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 810,000 parts per billion (ppb).[11]

32.     In 2007, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 48,000 parts per billion (ppb).[12]

///

///

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

GOMEZ TRIAL
ATTORNEYS

33.     The 1987 and 2007 concentration levels exceed state water quality objectives by unthinkable magnitudes.  A chart from the Regional Water Board's 2008 Administrative  Liability Complaint illustrates the excessive pollution caused by AMETEK:[13]

Table 1

| Waste Constituent | Ground-Water Concentration [a] (ug/l) | Basin Plan Water Quality Objective (ug/l) |
|---|---|---|
| Tetrachloroethylene (PCE) | 5,400 | 5 |
| Trichloroethylene (TCE) | 40,000 | 5 |
| 1,1-Dichloroethylene (1,1-DCE) | 1,300 | 6 |
| 1,1,1 – Trichloroethane (1,1,1-TCA) | 270 | 200 |
| 1,4 - Dioxane | 800 | 3* |

\* California Department of Public Health advisory Notification Level (NL).
[a] Data from the December 2007 Groundwater Monitoring Report.

**Largest Chlorinated Solvent Plume in the State of California**

34.     AMETEK'S waste discharge caused the largest TCE plume in the State of California.[14]

35.     The chlorinated solvent plumes are massive, extending 1.3 miles westward and down-gradient.  The plumes include the following chemicals and dimensions[15]:

    a.  TCE: 7,000 feet by 1,600 feet, migrated beneath 257 acres of land

    b.  DCE: 3,200 feet by 1,200 feet, migrated beneath 88 acres of land

    c.  Dioxane: 5,600 by 1,000 feet, extends across 128 acres of land

    d.  TCA: 1,200 feet by 400 feet, extends beneath 11 acres

36.     Additionally, plumes of PCE, 1,1-DCA, benzene, toluene, ethylbenzene, and xylene exist in the groundwater.[16]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

GOMEZ TRIAL
ATTORNEYS

37.     Magnolia Elementary School is immediately adjacent to and shares a property line with the AMETEK PROPERTY. The subject plume is directly beneath Magnolia Elementary School.

**AMETEK'S Water Quality Violations**

38.     The California Regional Water Quality Control Board filed the 2008 Administrative Liability Complaint against Defendant AMETEK, INC. for failing to comply with the previous 2002 Cleanup and Abatement Order No. R9-2002-201.[17] AMETEK, INC. committed the following violations.[18]

    a.  Failure to Report as Required by Directive No. 1: "Ametek failed to install and collect ground-water samples in accordance with Directive 1.e and failed to submit a complete Delineation Report by April 30, 2003….. the total number of days of violation is 1,974 days."

    b.  Failure to Submit a Complete Feasibility Study Report as Required by Directive No. 3: "Ametek failed to submit a complete Feasibility Study Report by January 16, 2004….. the total number of days of violation is 1,713 days."

39.     The California Regional Water Quality Control Board then imposed a fine of $2,269,000 for the above mentioned violations.[19]

    a.  "**$1,671,500 in liability for Failure to Report as Required by Directive No. 1…."**

    b.  "**$597,500 in liability for Failure to Submit a Complete Feasibility Study Report as Required by Directive No. 3…."**

/ / /

/ / /

/ / /

---

[17] *Id.*
[18] *Id.*
[19] *Id.*

**Knowing, Willful, and Intentional Failure to Cleanup and Abate the Contamination**

40.    AMETEK knowingly, willfully, and intentionally failed to establish monitoring wells, which were intended to identify the boundaries of and delineate the massive plume.  In the 2008 Administrative Liability Complaint, the California Water Board documented AMETEK'S willful, knowing, and intentional failures.[20]

a.   "After 20 years of investigation efforts, Ametek and S&K have not installed a sufficient monitoring well network to delineate the vertical and horizontal extent of the waste plume and have not taken any efforts to cleanup and abate the effects of their discharge."

b.   "Ametek and S&K are responsible for delineating and remediating the discharge of wastes."

c.   "Ametek and S&K were repeatedly advised that their submittals regarding plume delineation were incomplete or deficient, yet they failed to conduct additional work to address the deficiencies."

d.   "Ametek and S&K's failure to completely delineate the plume has allowed significant concentrations of contaminants to remain in place as a continued source of pollution."

e.   "Ametek and S&K failed to act appropriately, not only in their efforts to complete the delineation of the plume, but in their responsibilities to implement appropriate cleanup and abatement measures in a reasonable amount of time."

f.   "Such failures have caused a condition of pollution and contamination in the ground water beneath the El Cajon Valley with continuing impacts to the existing beneficial uses of the Santee/El Monte Basin."

/ / /

---

[20] Technical Analysis for Administrative Liability Complaint No. R9-2008-0033, September 2008.

GOMEZ TRIAL
ATTORNEYS

**Toxic Vapor Intrusion**

41.     In 2008, the Department of Toxic Substances Control (DTSC) entered into a Consent Order with AMETEK, documenting the following:[21]

    a.   "In June 2007, samples taken from ground water monitoring wells showed concentration of TCE of up to 50,000 micrograms per liter beneath the former Ketema facility, and up to 3,600 micrograms per liter beneath the Site."

    b.   "The corresponding modeled indoor air exposure at this level corresponds to a lifetime cancer risk in excess of one-in-ten-thousand $(10^{-4})$ at the Site.  The TCE groundwater plume is impacting the Site."

    c.   "Soil gas and indoor air quality sampling conducted between July 2004 and August 2005 at the Site showed TCE concentrations in the subsurface at up to 130 parts per billion by volume and inside the classrooms at levels up to 1.6 micrograms per cubic meter, as reported in "Results of Soil Vapor and Air Testing" dated May 27, 2005, and the "Results of Indoor Air Sampling" dated August 26, 2005."

    d.   "Exposure at this level corresponds to a lifetime cancer risk in excess of one-in-a-million $(10^{-6})$."

42.     In 2008, the DTSC identified the "Health Effects" of the chlorinated solvents and chemicals AMETEK had dumped into its SUMP:[22]

    a.   "Volatile Organic Compounds (VOCs) detected at the former Ketema facility and the Site include: 1) benzene, 2) chlorinated solvents, such as TCE, PCE, and 1,1 DCE."

---

[21] Consent Order, Department of Toxic Substances Control, California Environmental Protection Agency, Docket No. HAS-CO 07/08-198, 2008.
[22] *Id*.

GOMEZ TRIAL
ATTORNEYS

  b.  "Exposure to such chemicals may occur by inhalation of vapors coming from soil and groundwater, as well as ingestion of, and dermal contact with, VOCs in soil or water."

  c.  "Potential health effects include cancer, liver and kidney damage, respiratory impairment and central nervous system effects."

43.  In 2008, the DTSC identified the "Routes of Exposure" of those chlorinated solvents and chemicals:[23]

  a.  "Certain activities conducted at the former Ketema facility have contaminated soil and groundwater.  Because the contaminants found on the former Ketema facility and under the Site include VOCs, an assessment of all exposure routes will be conducted."

  b.  "The potential routes of exposure include inhalation, ingestion, and dermal contact."

44.  In 2008, the DTSC also identified the "Public Health and/or Environmental Risks":[24]

  a.  "Contaminants have been found in the soil and groundwater at the former Ketema facility and the Site.  Risks from these contaminants may be caused by exposure to soil vapor, soils and/or groundwater, through ingestion, inhalation of dusts, and/or vapors, and dermal contact."

  b.  "The groundwater is relatively shallow at the Site and indoor from groundwater via soil vapor was confirmed at the Site."

45.  Since 2012, the DTSC has recommended quarterly monitoring of indoor air quality in classrooms and quarterly monitoring of soil gas at Magnolia Elementary School.[25]

---

[23] *Id.*
[24] *Id.*
[25] Letter to Mr. James Beard, Cajon Valley School District, from Shahir Haddad, P.E., Supervising Engineer, Department of Toxic Substances Control, November 17, 2014.

**<u>Toxic Vapor Intrusion- A Recent History</u>**

46. In November 2014, the DTSC evaluated indoor air quality test results:[26]

    a. "Detection of TCE within one room (Room 8) exceeded the accelerated response action level for residential exposure scenarios (2 ug/m3)...."

    b. "PCE was detected in indoor air within several rooms, with one detection in Room 19 (3.1 ug/m3) exceeding DTSC's modified air screening level for industrial exposure scenarios (2.08 ug/m3) and two detections (Rooms 11 and 19) exceeding DTSC's modified air screening level for residential exposure."

    c. "Analysis of several indoor air contaminants (PCE, TCE, 1,1-DCE, 1,1,1-TCA, and 1,1-DCA) which likely appear in indoor air due to vapor intrusion and are found in nearby soil vapor wells, using a Schools Risk Screening Model (Schoolscreen, developed by the Office of Environmental Health Hazard Assessment (OEHHA)) indicates that both cancer risks and health hazards to on site staff and students may approach or exceed DTSC's points of departure for cancer risk (1 in one million excess risk) and hazards (hazard index of 1.0)."

47. In November 2014, the DTSC made conclusions and recommendations: [27]

    a. "Recent sampling of indoor and ambient air is consistent with vapor intrusion from contaminants in the subsurface into classrooms at Magnolia Elementary School."

    b. "Precautionary actions should be taken to increase ventilation in all classrooms."

/ / /

/ / /

---

[26] *Id*, attached Memorandum, SOIL VAPOR SURVEY AND INDOOR AIR QUALITY ASSESSMENT, From Patrick Kerzic, PhD, DABT, Staff Toxicologist, November 3, 2014.
[27] *Id*.

CLASS ACTION COMPLAINT

GOMEZ TRIAL ATTORNEYS

c. "In order to confirm detections of contaminants within indoor air, an additional round of air sampling should be performed as soon as possible."

d. "HERO (Human and Ecological Risk Office) supports the recommendation of a human health risk assessment for staff and students at Magnolia Elementary School."

**The December 2014 Vapor Intrusion Air Quality Test Results**

48.     After November 2014, in December 2014, indoor air quality was tested, and the results showed a spike in indoor air vapor intrusion.

49.     On May 7, 2015, the DTSC held a Community Update Meeting for Magnolia Elementary School, at which several teachers and parents of Magnolia students attended.  The DTSC interpreted results from the December 2014 vapor intrusion test results.

50.     As part of the meeting, the DTSC gave a presentation, including the following slides and information[28]:

51.



_____

[28] Presentation at Community Update Meeting for Magnolia Elementary School, Schools Evaluation and Brownfields Outreach, California Department of Toxic Substances Control, May 7, 2015.

GOMEZ TRIAL
ATTORNEYS

52.

# Chemicals at Magnolia Elementary School

❖ PCE (tetrachloroethylene): Carcinogen

❖ TCE (trichloroethylene): Carcinogen, reproductive and developmental toxin

❖ Breakdown products: 1,1-DCE, 1,1-DCA, 1,1,1-TCA

❖ From outdoor air: Benzene, carbon tetrachloride, others

Department of Toxic Substances Control

53.

# Previous Sampling Events and Results

| | Cancer Risk | Additional Risk in One Million |
|---|---|---|
| August 2014 | $4.5 \times 10^{-6}$ | 4.5 |
| December 2014 | $4.2 \times 10^{-5}$ | 42 |
| March 2015 | $5.6 \times 10^{-6}$ | 5.6 |



Department of Toxic Substances Control

CLASS ACTION COMPLAINT

GOMEZ TRIAL
ATTORNEYS

54.



**DTSC's Risk Management Range**

Highest cancer risk estimated Dec 2014: $4.2 \times 10^{-5}$

ACCEPTABLE — No Further Action

THE SITE SPECIFIC CONDITIONS DRIVE THE DECISION

UNACCEPTABLE — Further Action Required

Highest cancer risk estimated March 2015: $5.6 \times 10^{-6}$

Source: DTSC Vapor Intrusion Public Participation Advisory

Department of Toxic Substances Control

55.    The cancer risk for the December 2014 and the March 2015 levels are above the "ACCEPTABLE" range and entering the red zone.  The cancer risk for the December 2014 levels are in the red.

56.    The cancer risk appears to reach levels 42 times the threshold level which guides the DTSC to take action.

**Students and Teachers Exposed to Toxic Vapor Intrusion**

57.    Since about 1963, students and teachers at Magnolia Elementary School have been exposed to toxic vapor intrusion due to AMETEK'S dumping of chlorinated waste into the SUMP.

58.    Most likely, the vapor intrusion was even more significant 20 or 30 years ago because the groundwater contamination levels were higher—they were almost twenty times in 1987 what they were in 2007:

      a.  In 1987, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 810,000 parts per billion (ppb).

CLASS ACTION COMPLAINT

GOMEZ TRIAL
ATTORNEYS

b.  In 2007, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 48,000 parts per billion (ppb).

59.    Teachers and students spend hours in classrooms and on campus.  Students play in the fields and in the soil containing contaminated vapors.  Teachers and students breathe the contaminated air, often times in unventilated or under-ventilated rooms, exposed to toxins, for hours each week, for years during their educational or professional tenure.

**Center for Community Activity**

60.    Nestled in between Magnolia Elementary School and Greenfield Mobile Home Park is the Magnolia School Community Garden, where members of the community can rent plots of soil to grow their own vegetables, fruits, and herbs for personal consumption.  The Garden is on top of the contamination plume, according to Ametek's consultants.

61.



GOMEZ TRIAL
ATTORNEYS

62.



63.    On Magnolia School grounds, incorporated into the playground, is a San Diego Padres community little league facility, known as a "Little Padres Park," where children play baseball and softball. The San Diego Padres website lists the El Cajon facility as for "El Cajon Girls Softball."  The baseball/softball fields are on top of the contamination plume, according to Ametek's consultants.

64.



GOMEZ TRIAL
ATTORNEYS

65.



## DNAPL: Senior's Conscious Choice to Ignore the Risk to Children and Teachers

66.    Based on information and belief, and according to review of current and historical technical and legal documents, it appears the AMETEK/KETEMA site is still contaminated with subsurface DNAPL, or Dense Non-Aqueous Phase Liquid. DNAPL is free product chlorinated solvent which continues to provide a continual source of groundwater and soil contamination.

67.    As groundwater passes from east to west, from the AMETEK/KETEMA site underneath the school, the passing groundwater is contaminated by DNAPL TCE.

68.    As recently as the beginning of 2015, AMETEK'S own consultants, ERM, identified extremely high TCE concentrations in the subsurface groundwater beneath the AMETEK site, shown below at paragraphs 71 through 73.

69.    SENIOR OPERATIONS knows and has known, based on information and belief, since purchasing the property and aerospace business almost 20 years ago, that DNAPL TCE and other chemicals are continuously contaminating the groundwater and subsurface soil, thereby continuously trespassing and causing a known nuisance to children and teachers at Magnolia.

GOMEZ TRIAL
ATTORNEYS

70.     Despite such knowledge, and based on information and belief, SENIOR OPERATIONS has consciously ignored the danger to the children and teachers. Such willful disregard warrants punitive and exemplary damages.

71.     As set forth below in paragraphs 72 and 73, TCE Concentrations in the Groundwater, recorded in the 3rd Quarter of 2014 and the 1st Quarter of 2015, have reached levels as high as 29,000 micrograms per liter, 23,000 micrograms per liter, and 19,000 micrograms per liter.  These levels strongly suggest DNAPL TCE.

72.



/ / /

/ / /

73.



**Toxic Health Effects and the Need for Medical Monitoring Due to Exposure**

74.     The Agency for Toxic Disease Registry and U.S. Environmental Protection Agency provide information for some of these toxins[29]:

a.   TCE: *Affected Organ Systems*: Developmental (effects during periods when organs are developing), Neurological (Nervous System); *Cancer Classification*:  NTP: Reasonably Anticipated to be a Human Carcinogen; EPA: Carcinogenic to humans; IARC: Carcinogenic to humans (evidence for cancer is based on kidney cancer, limited evidence

---

[29] www.atsdr.cdc.gov

for non-Hodgkin lymphoma and liver cancer, as well as, various tumors in animals); *Chemical Classification*: Volatile organic compounds; *Summary:* Trichloroethylene (TCE) is a nonflammable, colorless liquid with a somewhat sweet odor and a sweet, burning taste. It is used mainly as a solvent to remove grease from metal parts, but it is also an ingredient in adhesives, paint removers, typewriter correction fluids, and spot removers. Trichloroethylene is not thought to occur naturally in the environment. However, it has been found in underground water sources and many surface waters as a result of the manufacture, use, and disposal of the chemical.

b. Vinyl Chloride: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Developmental (effects during periods when organs are developing), Hepatic (Liver), Immunological (Immune System); *Cancer Classification:* NTP: Known to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Vinyl chloride is a colorless gas. It burns easily and it is not stable at high temperatures. It has a mild, sweet odor. It is a manufactured substance that does not occur naturally. **It can be formed when other substances such as Trichloroethane (TCA), trichloroethylene (TCE), and tetrachloroethylene (PCE) are broken down.**

c. PCE: *Affected Organ Systems:* Developmental (effects during periods when organs are developing), Neurological (Nervous System), Respiratory (From the Nose to the Lungs); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds;

d. TCA: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Neurological (Nervous System); *Chemical Classification:* Volatile organic compounds; *Summary:* 1,1,1-

Trichloroethane is a synthetic chemical that does not occur naturally in the environment.

e.  DCE[30]: *Affected Organ Systems:*  Short-term: EPA has found 1,1-DCE to potentially cause the following health effects when people are exposed to it at levels above the MCL for relatively short periods of time: liver damage.  Long-term: 1,1-DCE has the potential to cause the following effects from a lifetime exposure at levels above the MCL: liver and kidney damage, as well as toxicity to the developing fetus; cancer; *Summary:* 1,1-DCE will evaporate from soil and will leach into the groundwater where its fate is unknown, but degradation is expected to be slow. Its tendency to accumulate in aquatic life is unknown but expected to be minor.

f.  Dioxane: *Affected Organ Systems:* Hepatic (Liver), Ocular (Eyes), Renal (Urinary System or Kidneys); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Summary:*  1,4-Dioxane is a clear liquid that easily dissolves in water. It is used primarily as a solvent in the manufacture of chemicals and as a laboratory reagent; 1,4-dioxane also has various other uses that take advantage of its solvent properties.

**Additional/Special Increased Risk to Children and Pregnant Women**

75.  Young children 10 years and younger, and pregnant women and their unborn babies, are especially susceptible and vulnerable to toxic exposure and associated risk thresholds are higher for children and pregnant women.

a.  The U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, published *ATSDR Case Studies in Environmental Medicine, Principles of Pediatric Environmental Health-*

---

[30] www.epa.gov

*The Child as Susceptible Host: A Developmental Approach to Pediatric Environmental Medicine, Course: WB2089*, which explains:

i.    "Childhood is a time of rapid growth and development. It is accompanied by changes in organ system functioning, metabolic capabilities, physical size, and behavior that can dramatically modify the effects, the illness, or both caused by toxicant exposure. Pediatricians and other clinicians caring for children need to understand these special susceptibilities."

ii.   "Children may ingest or inhale dirt or dust contaminated with… environmental toxicants during play or other normal activities. Questions could include exposures to indoor air and outdoor air pollutants and contaminated drinking water and soil."

iii.  "Soil intake ranged from a minimal estimate of 108 milligrams (mg)/day to a maximum of 1,834 mg/day of soil…."

iv.   "Children usually have increased exposures per kilogram of body weight, compared to adults."

v.    "Children's dynamic growth and development puts them at increased risk from environmental toxicants."

vi.   "Special consideration must be given to toxic exposures during fetal life, infancy, childhood, and adolescence."

vii.  "Because children grow and develop, they have a higher metabolic rate and thus have a greater need for oxygen….. Children breathe more air… per kilogram of body weight than do adults. These result in greater exposures per kilogram of body weight to any contaminants in the air…."

viii. "Children have an increased surface area-to-body mass ratio (in infants and young children) resulting in an increased risk of

dermal exposure and absorption."

ix.   "Children's long life expectancy increases their risk of adverse outcomes (e.g., cancer, renal or liver failure, senility) from exposures to those toxicants whose effects are expressed after a long latency period."

x.   "The rapid development of organ systems during embryonic, fetal, infant, and early childhood periods make children vulnerable when exposed to environmental toxicants."

xi.   "Parental exposures before a child is conceived can result in adverse reproductive effects, including Infertility, Spontaneous abortion, and Genetic damage to the fetus, possibly resulting in birth defects."

xii.   "Exposures to hazardous substances during pregnancy can potentially affect the development of fetal organ systems."

xiii.   "Exposures can cause profound systemic damage out of proportion with the dose response seen in adults."

xiv.   "A fact of fetal life is that the fetus cannot escape transplacental transport of toxicants to which the mother is exposed."

## CACI 3903B- Medical Monitoring- Toxic Exposure (Economic Damages)

76.   As a result of the above mentioned toxic exposure, the need for future medical monitoring is reasonably certain, and Plaintiffs, on behalf of themselves and the entire putative class, seek reasonable monitoring.

77.   The significance and extent of the class' exposure to the chemicals is extensive because teachers and students were exposed for many hours per day, for many months during the school year, and for many years during attendance or during teachers' employment.  Students have attended Magnolia from kindergarten through fifth, sixth, and even eighth grade.  Teachers have taught at Magnolia for many years, often 10 or

more years.  Students and teachers alike are enclosed in the classrooms, often with the door closed and/or without proper ventilation, exposed to toxic vapors.  Students also play in and on the soil, sand, and grass in and around the playground during recess and lunch.  Teachers eat in classrooms or inside, continuing their exposure throughout the day.  Teachers also often arrive before classes and stay after classed in order to prepare for their lessons and days.

78.     As described above, and documented by the ASTDR and the EPA, the subject chemicals are very toxic and can cause cancer, or liver, kidney, respiratory, neurological, developmental, and other diseases and illnesses.

79.     Due to the intrusion of these toxic chemicals, the class' chance of getting the above mentioned diseases as a result of the exposure is significantly higher when compared to their chances of developing those diseases had they not been exposed and when compared to the chances that members of the public at large will develop the disease.

80.     The seriousness of the diseases can be grave as cancer and organ disease can be deadly and/or extremely painful and tragic.

81.     The class will receive a significant medical benefit from early detection and diagnosis because early detection of cancer and organ disease can help doctors treat class members and hopefully prevent grave or very serious outcomes, such as late stage cancers and organ failure.

### First Cause of Action

**Negligence**

**(Against All Defendants)**

82.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 81.

83.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the putative class.

84.     Plaintiffs and members of the class were harmed by Defendants' negligent

GOMEZ TRIAL
ATTORNEYS

conduct as described above.

85.     Plaintiffs and members of the class were harmed by Defendants' negligent conduct.

86.     Defendants' negligent conduct was a substantial factor in causing Plaintiffs' and class members' harm.

87.     Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

## Second Cause of Action

### Gross Negligence

### (Against All Defendants)

88.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 87.

89.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the putative class.

90.     Plaintiffs and members of the class were harmed by Defendants' negligent conduct as described above.

91.     Plaintiffs and members of the class were harmed by Defendants' negligent conduct.

92.     Defendants' negligent conduct was a substantial factor in causing Plaintiffs' and class members' harm.

93.     Defendants' conduct lacked any care whatsoever and was an extreme departure from what reasonably careful companies would do.

94.     Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

///

///

///

///

### **Third Cause of Action**

**Public Nuisance**

**(Against All Defendants)**

95.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 94.

96.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the putative class.

97.     Plaintiffs and class members suffered harm because Defendants created a nuisance.

98.     Defendants, by acting and failing to act, created a condition that was harmful to health, and indecent and offensive to the senses, and an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life.

99.     The condition has affected a substantial number of people at the same time.

100.    An ordinary person would be reasonably annoyed or disturbed by the condition.

101.    The seriousness of the harm outweighs the social utility of Defendants' conduct.

102.    The Plaintiffs and class members did not consent to Defendants' conduct.

103.    Plaintiffs and class members suffered harm that was different from the type of harm suffered by the general public;

104.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

105.    Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

### **Fourth Cause of Action**

**Strict Liability- Ultrahazardous Activity**

**(Against All Defendants)**

106.    Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 105.

GOMEZ TRIAL
ATTORNEYS

107.   Defendants were and/or are engaged in the ultrahazardous activity of using, dumping, and/or maintaining toxic chemicals on their property as described above.

108.   Plaintiffs were and continue to be harmed.

109.   Plaintiffs harm is and was the kind of harm that would be anticipated as a result of the risk created by using, dumping, and/or maintaining toxic chemicals on Defendants' property.

110.   Defendants using, dumping, and/or maintaining toxic chemicals on their property was a substantial factor is causing Plaintiffs' harm.

WHEREFORE, Plaintiffs demand judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the costs of suit as allowed by law, and such other and further relief as this Court deems just and proper.

## DELAYED DISCOVERY AND EQUITABLE TOLLING

111.   At all times relevant herein, Defendants concealed relevant facts that would have allowed Plaintiff to discover the true nature and degree of the waste dumping, groundwater contamination, and vapor intrusion.   As a result of these misrepresentations, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiff and the Class.   Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiff and the Class with respect to the true nature, quality, and hazards of use of the waste dumping, groundwater contamination, and vapor intrusion as described herein and above.

112.   Plaintiff and members of the Class exercised due diligence to discover Defendants' wrongdoing.   However, such wrongdoing and/or the full extent and degree of such wrongdoing was not reasonably discoverable prior to the date of the filing of this action and/or prior to two years prior to the filing of this action since Defendants concealed their wrongdoing through misrepresentation.   Plaintiff exercised due diligence by promptly filing this Complaint after discovering the facts giving rise to

GOMEZ TRIAL
ATTORNEYS

these claims.

113.   Plaintiffs and members of the Class did not discover the true nature and degree of waste dumping, groundwater contamination, and/or the vapor intrusion until very recently, and certainly within two years, when the DTSC held a community meeting on May 7, 2015, to disclose recent air quality test results; and/or Plaintiffs and members of the Class did not discover the true nature and degree of waste dumping, groundwater contamination, and/or the vapor intrusion until recently, and certainly within two years, when newspaper articles reported on the matter in mid to late 2014.

114.   At no time prior to newspapers articles starting in mid to late 2014 were plaintiffs or any members of a putative class put on notice of a cause of action and thus no cause of action could have accrued before that time.

115.   Defendants conduct has created and continues to create an ongoing and continuous public nuisance, causing new contamination underneath Magnolia School each and every day.

## CLASS ACTION ALLEGATIONS

116.   Plaintiff and the members of the Class have all suffered injury in fact as a result of the exposure to harmful toxins, which was the result of Defendants' unlawful and grossly negligent conduct.

117.   The "Class Period" includes from 1963 to the date of the filing of this action.

118.   Plaintiffs bring this lawsuit on behalf of themselves and the other teachers and students of California who attended or worked at Magnolia Elementary School, who are similarly situated under Code of Civil Procedure section 382.   Subject to additional information obtained through further investigation and/or discovery, the proposed "Class" consists of the following:

"All students and teachers who attended or worked at Magnolia Elementary School, between 1963 to the present."

Excluded from the putative class are Defendants and their officers, directors, and

employees.  Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

119.  **Ascertainability.** The members of the Class are readily ascertainable by resort to Cajon Valley School District records, as well as through public notice.

120.  **Numerosity.**  The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains several tens of thousands of members.

121.  **Existence and predominance of Common Questions of Law and Fact.** Common questions of law and fact that exist as to all members of the Class predominate over any questions affecting only individual class members.  All members of the Class have been subject to the same

Conduct and exposure.  The common legal and factual questions include, but are not limited to, the following:

    a.    Whether Defendants dumped toxic waste into a SUMP;

    b.    Whether toxic waste escaped the SUMP and percolated into the groundwater beneath Magnolia Elementary School;

    c.    Whether the subject toxic waste caused vapor intrusion into classrooms and buildings at Magnolia Elementary School;

    d.    Whether the subject toxic waste caused vapor intrusion into the soil of the fields and grounds of Magnolia Elementary School;

    e.    Whether teachers and students were exposed to toxic vapors while teaching at or attending Magnolia Elementary School;

    f.    Whether DNAPL still causes a continual nuisance;

    g.    Whether Defendants' conduct was negligent and/or grossly negligent;

    h.    Whether the Defendants' conduct created a public nuisance;

    i.    Whether Defendants should be liable for medical monitoring costs;

    j.    Whether Defendants should be liable for compensatory damages.

122.  **Typicality.**  Plaintiffs' claims are typical of the claims of the members of

the Class in that Plaintiffs are members of the Class that Plaintiffs seek to represent. Plaintiffs, like members of the proposed Class, were exposed to toxic vapor intrusion while attending or teaching at Magnolia Elementary School.   Defendants have no defenses unique to Plaintiff.

123.   **Adequacy of Representation.**   Plaintiffs will fairly and adequately protect the interests of the members of the Class.   Plaintiffs have retained counsel experienced in environmental, mass, and class actions.   Plaintiffs have no adverse or antagonistic interests to those in the Class and will fairly and adequately protect the interests of the Class.   Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of the Plaintiff and proposed Class.

124.   **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.   Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.   Individualized litigation would also increase the delay and expense to all parties and the court system and the issues raised by this action.   The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants.   The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.   It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them.   Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.   Therefore, a class action is maintainable under Civil Code section 382.

125.   Unless a class is certified, Defendants will escape liability for decades-long exposure of toxic chemicals to innocent elementary school students and teachers. Unless class-wide damages and/or a medical monitoring program is ordered as compensation and as a deterrent, Defendants will also likely continue to allow innocent teachers and students to be exposed to toxic chemicals and denied their rights under California law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants, and each of them, and that Plaintiffs and the Class members be awarded damages under all causes of action, from Defendant, and each of them, as follows:

a.   Certifying the Class as requested herein;

b.   Punitive damages;

c.   Under all Causes of Action as allowable by law, compensatory damages;

d.   Under all Causes of Action as allowable by law, medical monitoring;

e.   Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery where necessary and as applicable, to prevent Defendants from retaining the benefits of their wrongful conduct;

f.   Statutory post-judgment interest allowable by law;

g.   Costs of this suit allowable by law;

h.   Reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5, as allowed by law; and,

///
///
///
///
///
///

i.   Awarding any and all other relief that this Court deems necessary or appropriate.

DATED:  August 7, 2015

**GOMEZ TRIAL ATTORNEYS**

By:  /s/ John P. Fiske
John H. Gomez
John P. Fiske

**BARON & BUDD, P.C.**
Scott Summy
Carla Burke
Celeste Evangelisti

## Trial by Jury

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demand, a trial by jury.

DATED:  August 7, 2015

**GOMEZ TRIAL ATTORNEYS**

By:  /s/ John P. Fiske
John H. Gomez
John P. Fiske

**BARON & BUDD, P.C.**
Scott Summy
Carla Burke
Celeste Evangelisti