1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10   DANIELLE TRUJILLO, as Guardian          CASE NO. 3:15-cv-1394-GPC-BGS
     Ad Litem for KADEN PORTER, a
11   minor, on behalf of himself and others   **ORDER:**
     similarly situated; LACEY
12   MORALES, as Guardian Ad Litem for       **GRANTING IN PART AND**
     ISABEL MORALES., a minor, on           **DENYING IN PART DEFENDANT**
13   behalf of herself and others similarly   **AMETEK'S MOTION TO DISMISS**
     situated; BEVERLY HOY, on behalf
14   of herself and all others similarly      [ECF No. 25]
     situated,
15                                            **GRANTING IN PART AND**
                                    Plaintiffs, **DENYING IN PART DEFENDANT**
16                                            **SENIOR OPERATION'S MOTION**
         v.                                   **TO DISMISS**
17
                                              [ECF No. 24]
18

19   AMETEK, INC., a Delaware
     corporation; SENIOR OPERATIONS,
20   LLC, a limited liability company; and
     DOES 1 through 100, inclusive,
21
                                   Defendants.
22

23          Before the Court are Defendant Ametek, Inc. ("Ametek") and Defendant Senior

24   Operations, LLC's ("Senior" or "Senior Operations") separate Motions to Dismiss.

25   Def. Ametek's Mot. Dismiss ("Am. Mot."), ECF No. 25; Def. Senior Operations' Mot.

26

27

28

Dismiss ("Sen. Mot."), ECF No. 24. The motions have been fully briefed.[1] *See* Pls.'

Opp'n Def. Ametek's Mot. Dismiss ("Am. Opp."), ECF No. 33; Reply Pls.' Opp'n Def.

Ametek's Mot. Dismiss ("Am. Reply"), ECF No. 37; Pls.' Opp'n Def. Senior

Operations' Mot. Dismiss ("Sen. Opp."), ECF No. 34; Reply Pls.' Opp'n Def. Senior

Operations' Mot. Dismiss ("Sen. Reply"), ECF No. 38.

Upon consideration of the moving papers and the applicable law, and for the

foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Ametek's

Motion to Dismiss and **GRANTS IN PART** and **DENIES IN PART** Senior

Operation's Motion to Dismiss.

## FACTUAL BACKGROUND

This case arises out of the dumping of toxic waste by Defendants and their

predecessors into a temporary waste storage tank (or "sump") on their property on

Greenfield Drive in El Cajon, California ("Ametek property"). Am. Compl. ("Compl.")

4, ECF No. 21. Aircraft engine parts were manufactured in the Greenfield facility from

1953 or 1954, when the facility was founded by California Aircraft Products ("CAP"),

until 1988. *Id.* at 4–5. In 1964, CAP changed its name to Straza Industries. *Id.* at 4.

Defendant Ametek purchased Straza Industries in 1968. *Id.* Defendant Senior

Operations subsequently purchased the Ametek property in or around 1998. Am. Mot.

Exs. 2–3.

Plaintiffs allege that from 1963 to 1985, owners of the Ametek property used a

sump to temporarily store toxic waste which consisted of a 12 feet in diameter and 10

feet deep hole in the ground. Compl. 5. The hole was lined with redwood planks on the

sides and had a poured concrete base. *Id.* Plaintiffs allege that between 1963 and 1985,

Defendants or their predecessors dumped up to 7,000 gallons of waste per month into

---

[1]The Court notes that it does not dismiss the case despite the fact that Plaintiffs' briefing consisted largely of recitations of the Complaint and the California Civil Jury Instructions without reference to the applicable law. *See, e.g.*, Sen. Opp. 12–23. Plaintiffs are cautioned that bare recitations of the required elements of each cause of action do not suffice as briefing at the motion to dismiss stage, and that counsel are expected to support their positions with relevant legal precedent.

the sump, including (a) spent acid and alkaline solutions; (b) industrial chlorinated solvents; (c) 1, 1, 1,- tricholorethane ("TCA"); (d) trichloroethylene ("TCE"); (e) tetrachloroethylene ("PCE"); (f) oils; (g) paint thinner; and (h) process sludge. *Id.* at 5–6. Perhaps unsurprisingly given the nature of the sump, Plaintiffs allege that the waste stored therein deteriorated and breached the sump, resulting in toxic waste seeping and percolating into the surrounding soil, fractures in the granite rock, and into the groundwater over the subsequent years. *Id.* at 6.

Plaintiffs allege that Defendants' waste discharge caused a massive waste plume, including the largest TCE plume in the State of California. *Id.* at 7. Plaintiffs allege that the plume "extend[s] 1.3 miles westward and down-gradient" and includes large amounts of TCE, 1,1-dichloroetyhlene ("DCE"), dioxane, and TCA, as well as smaller amounts of PCE, 1, 1-dichloroethane ("DCA"), benzene, toluene, ethylbenzene, and xylene. *Id.*

State authorities have been aware of the waste discharge from the Ametek property since at least the 1980's. *Id.* at 9. In 2008, the California Regional Water Quality Control Board for San Diego County ("Water Board"), which oversees the identification and monitoring of groundwater contamination, remediation, and ensuring compliance with California Water Code, *see, e.g.*, 23 C.C.R. § 640; 23 C.C.R. § 2907; Cal. Water C. § 13300, et seq, filed an Administrative Liability Complaint which charged Defendants with failure to install a sufficient monitoring well network to delineate the extent of the waste plume and failure to take "any efforts to cleanup and abate the effects of their discharge" despite "20 years of investigation efforts" and Defendants being "repeatedly advised" that their monitoring and remediation efforts were deficient. *Id.* at 9. The Complaint stated that Defendants "fail[ure] to act appropriately" had resulted in "a condition of pollution and contamination in the ground water beneath the El Cajon Valley with continuing impacts to the existing beneficial uses of the Santee/El Monte Basin." *Id.* The California Department of Toxic Substances Control ("DTSC"), which has oversight of remediation of toxic

contamination, has also been monitoring the waste plume. *Id.* at 10.

Magnolia Elementary School ("Magnolia") is immediately adjacent to and shares a property line with the Ametek property. *Id.* at 8. Plaintiffs allege that the waste plumes are directly beneath Magnolia. *Id.* On May 7, 2015, DTSC held a Community Update Meeting at Magnolia where the agency presented results from ongoing monitoring of toxic vapor intrusion into the school. *Id.* at 13. The presentation included information as to how vapors from toxic plumes can enter cracks in the ground of a building and affect the indoor air quality. *Id.* The presentation explained that PCE is a carcinogen and TCE is a "carcinogen, reproductive and developmental toxin." *Id.* at 14. The presentation also showed that the cancer risk from toxic vapor intrusion inside Magnolia was increasing, from 4.5 parts per million in August 2014 to 5.6 parts per million in March 2015, with a temporary spike in December 2014 to 42 parts per million. *Id.* Finally, the DTSC presentation included a slide showing that the cancer risk level was veering from the "Acceptable" (no further action required) to "Unacceptable" (further action required) range during this time, although the cancer risk level had not yet crossed the threshold into the "Unacceptable" zone. *Id.* at 15. In the intermediate zone where the cancer risk levels measured from August 2014 to March 2015 were located, the slide described the situation as one where "the site specific conditions drive the decision." *Id.*

Plaintiffs allege that the various chemicals found in the waste plume and by vapor monitoring have been found by federal agencies, including the Agency for Toxic Substances and Disease Registry ("ATSDR") and the Environmental Protection Agency ("EPA"), to have toxic health effects. *Id.* at 20. In particular, Plaintiffs allege that TCE and PCE are listed as having developmental, neurological, and carcinogenic effects on humans; vinyl chloride, which can be formed when other substances such as TCA, TCE, and PCE break down, has cardiovascular, developmental, hepatic, immunological, and carcinogenic effects; TCA has cardiovascular and neurological effects; DCE can cause liver, kidney, and developmental effects; and dioxane can have

hepatic, ocular, renal, and carcinogenic effects. *Id.* at 20–22. Moreover, Plaintiffs allege that children 10 years and younger as well as pregnant women and their unborn children are especially vulnerable to toxic exposure. *Id.* at 22.

On June 1, 2015, the Board of Governors of the Cajon Valley Union School District voted unanimously to close Magnolia for the 2015-2016 school year because of the risk of toxic vapor intrusion. *Id.* at 1.

## PROCEDURAL BACKGROUND

Plaintiffs are students and teachers at Magnolia. *Id.* at 3. On May 29, 2015, Plaintiffs filed a class action complaint on behalf of themselves and all others similarly situated against Defendants in the Superior Court of the State of California in the County of San Diego. Def. Notice Removal 1, ECF No. 1. On June 25, 2015, Defendants removed the case to federal court on the basis of diversity jurisdiction. *Id.* at 3. On August 7, 2015, Plaintiffs filed an amended complaint. ECF No. 21.

Plaintiffs bring four causes of action for (1) negligence; (2) gross negligence; (3) public nuisance; and (4) strict liability (ultrahazardous activity). Compl. 25–28. Plaintiffs seek punitive as well as compensatory damages as to each cause of action, as well as medical monitoring costs. *Id.* at 32; *see also id.* at 24–28. Defendants filed separate motions to dismiss on August 24, 2015. ECF Nos. 24, 25. Plaintiffs responded on October 2, 2015. ECF Nos. 33, 34. Defendants replied on October 16, 2015. ECF Nos. 37, 38.

## LEGAL STANDARD

A Rule 12(b)(6) dismissal may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 679 (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555 (noting that on a motion to dismiss the court is "not bound to accept as true a legal conclusion couched as a factual allegation."). "The pleading standard . . . does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citations omitted). "Review is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *See Metlzer Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

In analyzing a pleading, the Court sets conclusory factual allegations aside, accepts all non-conclusory factual allegations as true, and determines whether those nonconclusory factual allegations accepted as true state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 676–84; *Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) (noting that "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal.") (internal quotation marks and citation omitted). And while "[t]he plausibility standard is not akin to a probability requirement," it does "ask[] for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted). In determining plausibility, the Court is permitted "to draw on its judicial experience and common sense." *Id.* at 679.

//

//

**DISCUSSION**

## I.    Judicial Notice

"Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff['s] claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citations omitted). In addition, Fed.  R. Evid. 201(b) permits judicial notice of a fact when it is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The court may take notice of such facts on its own, and "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c).

Under Rule 201, the court can take judicial notice of "[o]fficial acts of the legislative, executive, and judicial departments of the United States," as well as the "records and 'reports of administrative bodies.'" *Jackson v. Specialized Loan Servicing, LLC*, 2014 WL 5514142, at *4 (C.D. Cal. Oct. 31, 2014) (citing *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008)). This includes documents in the public files of the Water Board and DTSC. *See, e.g.*, *Tyco Thermal Controls LLC v. Rowe Indus., Inc.,* 2010 WL 4056007, at *1 (N.D. Cal. Oct. 15, 2010); *SPPI-Somersville, Inc. v. TRC Companies, Inc.*, 2006 WL 1627010, at *4 n.1 (N.D. Cal. June 12, 2006).  Press coverage and news articles are also judicially noticeable under Rule 201. *See Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 976 (9th Cir. 1999)

Defendants seek judicial notice of a variety of items, which primarily consist of memorandums, correspondence, orders, and records of proceedings issued by the

Water Board, DTSC, and other state agencies; authenticated correspondence between Defendants and said agencies; court documents; newspaper articles; and real property transaction records. *See generally* Am. Mot. Exs.; Sen. Mot. Exs. Plaintiffs argue that these items should not be considered because they constitute "extrinsic information or documents." Am. Opp. 2; Sen. Opp. 3. However, plaintiffs do not dispute the authenticity of these documents. The Court finds that these items are appropriate for judicial notice because they are matters of public record, the parties do not dispute their authenticity, and they are central to Plaintiff's claims. Therefore, the Court **GRANTS** Defendants' requests for judicial notice, with the exception of Sen. Mot. Exs. K and M, which appear to be unauthenticated correspondence between a private consultant, Robert Morrison, and an official of the Cajon Valley Union School District that does not fall into any provision of Rule 201.

## II.     Ametek's Motion to Dismiss

Ametek argues that the case should be dismissed because: (1) Plaintiffs have failed to adequately plead facts supporting each of their causes of action; (2) Plaintiffs fail to plead facts entitling them to medical monitoring; (3) Plaintiffs lack standing; and (4) the statute of limitations bars Plaintiffs' claims. Ametek also argues that Plaintiffs are not entitled to punitive damages. Since some of Ametek's arguments overlap with each other, the Court will address Ametek's arguments grouped as appropriate.

### A.     Speculative harm (negligence/medical monitoring/standing)

Ametek makes a number of arguments that essentially boil down to the proposition that the case must be dismissed because Plaintiffs advance only a speculative claim of harm. In particular, Ametek argues that an allegation of actual, present physical injury is necessary to: (1) a negligence claim; (2) damages for medical monitoring; and (3) standing. *See* Am. Mot. 10–11; 14–15; 17–18.

To resolve these arguments, it is necessary to turn to California's precedents

in toxic tort cases. Toxic tort cases present difficult problems of scale, causation, and latency as compared to traditional tort cases that have prompted courts to take a distinctive approach to such cases. *See* 1 Toxic Torts Litigation Guide § 1:4. In particular, California permits a claim for damages for medical monitoring costs in toxic torts cases even where there is no present physical injury. *See Miranda v. Shell Oil Co.*, 17 Cal. App. 4th 1651, 1656 (1993); *see also Potter v. Firestone Tire & Rubber Co.* 6 Cal. 4th 965, 1007 (1993) (adopting *Miranda*'s approach). As the Court of Appeal put it in *Miranda*,

> A plaintiff who is involved in an automobile accident and suffers no observable physical injury but nevertheless undergoes medically necessary diagnostic tests to determine whether internal injuries exist is no doubt entitled to recover the costs of the examination. If accepted medical practice also deemed it necessary to perform such tests in the future, in order to detect the onset of any subsequently developing injury caused by the accident, the costs of the continued testing would be recoverable under Civil Code section 3333. The outcome should be the same when the operative incident is toxic exposure rather than collision and the potential future harm is disease rather than physical impairment.

17 Cal. App. 4th at 1657 (citing *Friends For All Children v. Lockheed Aircraft Co.*, 746 F.2d 816, 825 (D.C. Cir. 1984)). Such a right to medical monitoring is not absolute: "the toxic-tort plaintiff who seeks money damages for future medical surveillance is required to establish that the need for monitoring is a reasonably certain consequence of the exposure." *Id. Miranda* sets forth a five-factor test for when this standard is met, which considers:

> (1) the significance and extent of the plaintiff's exposure to the chemicals;
> (2) the relative toxicity of the chemicals;
> (3) the seriousness of the diseases for which plaintiff is at an increased risk;
> (4) the relative increase in the plaintiff's chances of developing a disease as a result of the exposure, when compared to (a) plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of members of the public at large developing the disease; and
> (5) the clinical value of early detection and diagnosis.

*Id.* at 1657–58.

The Court of Appeal noted that this does not mean that the plaintiff must

show that "it is reasonably certain he or she will actually contract a particular disease or suffer some definite future affliction." *Miranda*, 17 Cal. App. 4th at 1658. Instead, "medical monitoring damages reimburse the specific cost of periodic medical testing which is proved by a reasonable medical certainty to be necessary." *Id.* The Court of Appeal reasoned that a number of "sound policy concerns" supported this balanced approach, including "(1) public health interest in encouraging and fostering access to early medical testing for those exposed to hazardous substances; (2) possible economic savings realized by the early detection and treatment of disease; (3) deterrence of polluters; and (4) elemental justice." *Id.* at 1660 (citations omitted).

In so holding, the *Miranda* court emphasized that they were not creating a "new cause of action." *Id.* at 1658 (internal quotation marks omitted). Instead, the court conceived of recovery of medical monitoring costs as a component of the consequential damages which flow from established torts. As the *Potter* court put it, "[r]ecognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery." 6 Cal. 4th at 1007. Indeed, *Potter* itself dealt with medical monitoring costs in the context of a negligence action. *Id.* at 974. Thus, the fact that Plaintiffs have not alleged a present physical injury is not a basis to dismiss their negligence cause of action or their damages claim for medical monitoring.

Ametek alsos argue that Plaintiffs should not be entitled to pursue a damages claim for medical monitoring because they have not pled facts that would satisfy *Miranda*'s five-factor test. Am. Mot. 15. In particular, Ametek argues that in December 2014, DTSC mailed a Community Update expressly stating that "[t]hese levels [of toxic vapors] do not pose a significant risk to human health," and that the Water Board and DTSC "have repeatedly . . . emphazis[ed] that there is no health risk associated with vapor levels at Magnolia." *Id.* Ametek relies on *Riva v.*

*Pepsico, Inc.*, 82 F. Supp. 3d 1045 (N.D. Cal. 2015) to support the proposition that Plaintiffs' damages claims should be dismissed for failure to plead factual content showing that there was a "significant" increase in their risk of developing cancer. Am. Mot. 15.

Ametek's reliance on *Riva* is misplaced. In *Riva*, the district court granted a motion to dismiss where plaintiffs alleged that the presence of 4-methylimidazole ("4-mel") in defendant's products entitled them to medical monitoring costs. The district court found that the plaintiffs failed to plead factual content showing that there was a "significant" increase of developing lung cancer where studies had found clear evidence of the carcinogenic effects of 4-mel on *mice*, but not *humans*, *id.* at 1059 ("[T]he Riva Plaintiffs are not mice, and there is nothing in the [Complaint], or the studies incorporated by reference, to suggest that 4-Mel causes this specific form of lung cancer in humans."), contrasting the facts of the case with those in a number of other cases where courts upheld medical monitoring claims where the toxic exposures had a demonstrable risk to health, *see id.* at 1060 (citing cases). The district court also noted as an additional deficiency that the plaintiffs had not presented "the quantitative (or even qualitative) increased risk to individuals." *Id.* at 1062 (citing *Abuan v. General Elec. Co.*, 3 F.3d 329 (9th Cir. 1993)).

By contrast, here, Plaintiffs allege that the ATSDR and the EPA have established the health risks that TCE, PCE, and other present chemicals have upon humans, including developmental, neurological, and carcinogenic effects. *See* Compl. 20–22. Moreover, they allege that the named chemicals have been found by the ATSDR to be particularly harmful for young children and pregnant women. *Id.* at 22–24. In addition, in contrast to the *Riva* plaintiffs, Plaintiffs here have quantified the increased cancer risk they allege was presented to them by the DTSC: an increase in cancer risk of a range of 5.6 to 42 chances in a million. *Id.* at 15.

What is more, even if it is true that the Water Board and DTSC have in the

past not found that the toxic vapor levels in the school posed a significant risk to human health, that previous determination by state administrative agencies would not be binding upon this Court. The California Supreme Court contemplated that establishing whether the *Miranda* standard is met is usually a question for the trier of fact, since "competent medical testimony" will usually be required to determine "whether and to what extent the particular plaintiff's exposure to toxic chemicals in a given situation justifies future periodic medical monitoring." *Potter*, 6 Cal. 4th at 1009; *see also Riva*, 82 F. Supp. at 1055. Thus, it is inappropriate to decide whether Plaintiffs have satisfied the *Miranda* factors at the motion to dismiss stage.

Finally, Ametek also argues that Plaintiffs' failure to establish actual injury defeats Article III's standing requirement. Am. Mot. 17–18. It is well-established that Article III standing requires (1) injury in fact; (2) causality; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Ametek again relies on *Riva* to argue that Plaintiffs cannot show injury in fact. But as *Riva* itself discussed, the Ninth Circuit has previous found that "[i]ncreased risk of injury can suffice to establish an Article III injury-in-fact where the increased risk of injury is credible and not conjectural." 82 F. Supp. 3d at 1052 (citing *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002)). In *Central Delta*, the Ninth Circuit found standing where plaintiffs challenged a plan to release reservoir waters where the plan was projected to violate the state salinity standards for a neighboring river, ultimately threatening to jeopardize plaintiffs' crops, finding that the "threat of injury resulting from [Defendants] employing an operational plan that will likely lead to violations of the [state salinity] standard is sufficient to confer standing on plaintiffs." *Id.* at 948.

Thus, the standing problem in *Riva* was not that plaintiffs' harm was speculative, but that it was not "credible" for the reasons identified above. 82 F. Supp. 3d at 1053. By contrast, here, as discussed above, Ametek has failed to show that, construing the facts in the light most favorable to Plaintiffs, Plaintiffs cannot

demonstrate a "credible" increased risk of cancer.

### B.   Other causes of action

#### i.   Gross Negligence

Ametek argues that Plaintiffs have failed to adequately plead facts supporting gross negligence. Am. Mot. 11. Gross negligence has long been defined as a either a "want of even scant care" or "an extreme departure from the ordinary standard of conduct." *City of Santa Barbara v. Superior Court,* 41 Cal. 4th 747, 754 (2007).

Ametek argues that Plaintiffs cannot show that Ametek failed to exercise even scant care, since the Water Board's Executive Officer's Reports "routinely note" that "Ametek continues to conduct on-site and off-site soil vapor monitoring and groundwater monitoring in accordance with its cleanup and abatement order." Am. Mot. 12 (citing Ex. 39). Even assuming that is correct, however, as Plaintiffs point out, Am. Resp. 6, the Water Board also filed an Administrative Liability Complaint in 2008 criticizing Defendants for "hav[ing] not installed a sufficient monitoring well network to delineate the vertical and horizontal extent of the waste plume and hav[ing] not taken any efforts to cleanup and abate the effects of their discharge" despite "20 years of investigation efforts," and stating that Defendants "were repeatedly advised that their submittals regarding plume delineation were incomplete or deficient, yet they failed to conduct additional work to address the deficiencies," Compl. 9. Plaintiffs allege that over the course of over two decades, Ametek "dump[ed] 1.848 million gallons of toxic waste next to an elementary school," and then "fail[ed] to clean up or abate the toxic plume it created, knowing it flowed beneath an elementary school." Am. Resp. 6. Viewing these allegations in the light most favorable to Plaintiffs, Plaintiffs have plausibly stated a claim for gross negligence.

#### ii.   Public Nuisance

Ametek argues that Plaintiffs have failed to adequately plead facts supporting a private claim for public nuisance because they have not demonstrated that they

suffer a harm that is unique to them as opposed to the general public. Am. Mot. 12. The general rule is that public nuisance actions must be brought by government officials. *Cty. of Santa Clara v. Superior Court*, 50 Cal. 4th 35, 55 (2010) (citing Cal. Civ. Code §§ 3493–3494). However, a private party may bring a public nuisance action where the nuisance is "specially injurious" to the private party, beyond the harm caused by the nuisance to the general public. *Birke v. Oakwood Worldwide*, 169 Cal. App. 4th 1540, 1548 (2009) (citing Cal. Civ. Code § 3493). This exception has its origins in the common law, which recognized that "'the action would lie if the plaintiff could show that he had suffered special damage over and above the ordinary damage caused to the public at large by the nuisance." *Venuto v. Owens-Corning Fiberglass Corp.*, 22 Cal. App. 3d 116, 123–24 (1971) (quoting Prosser on Torts 608 (3d ed.)).

Plaintiffs argue that they have been specially injured because they have been "expos[ed] to toxic vapors in excess of the general public" and "have been exposed to the highest concentrations in the worst conditions for the longest periods of time." Am. Resp. 8–9. Ametek relies on *Venuto* to argue that in order to show special injury, Plaintiffs must allege facts showing injury to themselves "different *in kind* from that suffered by the general public," rather than just in degree. *Venuto*, 22 Cal. App. 3d at 124 (citing cases); *see also* Am. Mot. 13. In *Venuto*, the Court of Appeal rejected a public nuisance claim where plaintiffs alleged that air pollution from a fiberglass manufacturing plant aggravated their allergies and respiratory disorders where "such allegations merely indicate[d] that plaintiffs and the members of the public are suffering from the same kind of ailments but that plaintiffs are suffering from them to a greater degree." 22 Cal. App. 3d. at 125.

Other courts have disagreed about the viability of *Venuto*'s approach. In *Birke v. Oakwood Worldwide*, the Court of Appeal suggested that *Venuto* might be an "incorrect statement of the law" while reversing the trial court's dismissal of a public nuisance claim where the plaintiff alleged that a residential apartment

complex owner's failure to limit secondhand smoke in outdoor common areas aggravated her allergies and asthmatic symptoms. 169 Cal. App. 4th at 1550 (quoting *Lind v. City of San Luis Obispo*, 109 Cal. 340, 344 (1895) ("[A]n injury to private property, or to the health and comfort of an individual, is in its nature special and peculiar and does not cause a damage which can properly be said to be common or public, however numerous may be the cases of similar damage arising from the same cause." (alteration in original)); Restatement (Second) of Torts § 821C com. d. (1979) ("When the public nuisance causes personal injury to the plaintiff or physical harm to his land or chattels, the harm is normally different in kind from that suffered by other members of the public and the tort action may be maintained.")). *But see Guttman v. Nissin Foods (U.S.A.) Company, Inc.*, No. C 15-00567 WHA, 2015 WL 4309427, at *5 (N.D. Cal. July 15, 2015) (suggesting that *Birke* should be limited to its facts, since "the injury contemplated in that decision was the aggravation of the plaintiff's asthma due to the alleged nuisance of second-hand smoke, which was a special injury as compared to the general public's increased risk of lung cancer"). And in *Lind*, the California Supreme Court permitted a private suit for public nuisance to go forward where a defendant sewage company had built a storage vault 300 feet from plaintiff's house. 109 Cal. 340 at 342. While the stench was noticeable to those living further away, it was particularly "intolerable" for plaintiff and one or two of his neighbors that lived closest to the sewage vault. *Id.* The Court found that the stench constituted a "special injury" to the rights of the plaintiff which was "not common to the public generally." *Id.* at 438.

After consideration of the applicable law, the Court finds that Plaintiffs have alleged a plausible case for public nuisance. Plaintiffs' claim that they have been specially injured by the contamination since they are directly adjacent to the Ametek facility is similar to the claim in *Lind* that the plaintiff in that case was specially injured by the close proximity of the sewage vault to their home. It is possible that further factual development could reveal that the harm suffered by Plaintiffs is too

similar to that suffered by the general public, since the 1.3 mile waste plume Plaintiffs are alleging could be emitting the same types of toxic vapors throughout a wide area affecting the general community. However, given the dispute as to the applicable law and the extent of the plume, the Court is not prepared to dismiss Plaintiffs' public nuisance claim at this stage of the litigation.

### iii.    Strict Liability

Ametek argues that Plaintiffs have failed to adequately plead facts supporting a claim for strict liability based on ultrahazardous activity. A six-part test is used to determine whether a particular activity is ultrahazardous and thus subject to strict liability:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*In re Burbank Envtl. Litig.*, 42 F. Supp. 2d 976, 983 (C.D. Cal. 1998) (citing Restatement (Second) of Torts § 520 and cases). A number of courts have determined that under this test, the act of using solvents such as TCE and PCE to clean metal parts in an industrial site is not an ultrahazardous activity, because the risks associated with the use, storage, and/or disposal of such industrial solvents can be avoided through the exercise of reasonable car. *Id.* (citing *Schwartzman, Inc. v. General Elec. Co.*, 848 F. Supp. 942, 945 (D.N.M. 1993); *Greene v. Product Mfg. Corp.*, 842 F. Supp. 1321, 1326–27 (D. Kan. 1993); *see also Palmisano v. Olin Corp.*, No. C-03-01607 RMW, 2005 WL 6777560, at *17 (N.D. Cal. June 24, 2005). Plaintiffs cite no cases supporting the proposition that the use, storage and/or disposal of such solvents is considered an ultrahazardous activity. Accordingly, Plaintiffs' strict liability (ultrahazardous activity) claim is **DISMISSED**.

### C.    Statute of Limitations

Ametek argues that Plaintiffs cannot satisfy the two-year statute of limitations

for toxic tort actions in California. Am. Mot. 18. Cal. Civ. Proc. Code § 340.8(a) states:

> In any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later.

Ametek argues that the cause of action accrued more than two years ago since by 2004 at the latest, DTSC had advised of the risks revealed by the 2004 round of vapor monitoring at Magnolia. Am. Mot. 19. Plaintiffs respond that even if this is so, they satisfy the requirements for the "delayed discovery" rule specified in the latter part of § 340.8(a). Am. Resp. 19. Plaintiffs argue that they did not have notice of the waste plume until May 7, 2015, when DTSC held the community meeting where the recent air quality test results were disclosed. *Id.* at 20.

Ametek argues that even if Plaintiffs did not have actual notice until May 7, 2015, Plaintiffs are charged with inquiry notice of the waste plume under the delayed discovery rule. *See* Am. Mot. 20–21. Ametek relies on *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1114 (1988), *Camsi IV v. Hunter Tech. Corp.*, 230 Cal. App. 3d 1525, 1530 (1991), and *Aguirre v. Larkin*, No. B253575, 2015 WL 1577323, at *9 (Cal. Ct. App. Apr. 8, 2015) (unpublished) to support the proposition that the limitations period begins when a plaintiff is put on inquiry notice of wrongdoing. Under this line of reasoning, Plaintiffs should have been aware of the health risk posed by the waste plume by 2012 at the latest, since by that time DTSC had recommended quarterly monitoring of indoor air quality in classrooms and soil and gas at the school, the Ametek facility and the cleanup and abatement operations were open and notorious operations which have been subject to "countless public meetings, hearings, and notices," including notices to Magnolia students, parents, and staff, and many news articles have been written about the ongoing controversy. Am. Mot. 23.

However, Ametek's reliance on these cases to support their argument that Plaintiffs should have been on inquiry notice is misplaced. In *Eli Lilly*, the Supreme Court of California extensively discussed the standard of notice applicable under the delayed discovery rule. The Court found that under the delayed discovery rule, the statute of limitations only begins to run once the plaintiff has a "suspicion of wrongdoing," that is, "that someone has done something wrong to her." 44 Cal. 3d at 1110. The Court then found that the one-year statute of limitations barred plaintiff's claim, since plaintiff testified that well over a year before she filed suit, she had wanted to "'make a claim' [because] she felt that someone had done something wrong to her concerning [the drug at issue], that it was a defective drug and that she should be compensated." *Id.* at 1112.

In other words, as the Court of Appeal later put it in *Alexander v. Exxon Mobil*, 219 Cal. App. 4th 1236, 1251 (2013):

> [A] two-part analysis is used to assess when a claim has accrued under the discovery rule. The initial step focuses on *whether the plaintiff possessed information that would cause a reasonable person to inquire into the cause of his injuries*. Under California law, this inquiry duty arises when the plaintiff becomes aware of facts that would cause a reasonably prudent person to suspect his injuries were the result of wrongdoing. If the plaintiff was in possession of such facts, thereby triggering his duty to investigate, it must next be determined whether "such an investigation would have disclosed a factual basis for a cause of action[.] [T]he statute of limitations begins to run on that cause of action when the investigation would have brought such information to light."

*Id.* (second and third alterations in original) (citations omitted).

The cases the Court discussed in *Eli Lilly* bear out this point. First, in *Miller v. Bechtel Corp.*, 33 Cal. 3d 868 (1983), the Court held that a plaintiff was barred by the statute of limitations from pursuing her suit for fraud when plaintiff had long-held suspicions that her former husband had concealed the true worth of his assets during dissolution negotiations, but where "neither she nor her attorney took adequate steps then to investigate the matter." 44 Cal. 3d at 1111. The Court held that "her early suspicion put her on inquiry notice of the potential wrongdoing." *Id.* Second, in *Gray v. Reeves*, 76 Cal. App. 3d 567 (1978), the Court of Appeal held

3:15-cv-1394-GPC-BGS

that a plaintiff was barred by the statute of limitations where the plaintiff had suffered an allergic reaction to a drug in 1971, but delayed filing suit against the prescribing doctor and manufacturer until 1973. 44 Cal. 3d at 1111 "The Court of Appeal noted plaintiff's admission that in 1971 he knew defendants 'did something wrong'" in finding that "[e]ven without specific facts as to why the drug was defective, plaintiff was on notice at that time that he had a potential cause of action." *Id.* (citations omitted).

The other cases Ametek cites are similarly unavailing. In *Camsi IV*, the Court of Appeal found that a company that purchased a parcel of land from defendants could not meet the three-year statute of limitations for their toxic tort suit where their actions in only selling "uncontaminated" portions of their property more than three years before filing suit demonstrated their awareness that some of the land was contaminated. *Camsi IV v. Hunter Tech. Corp.*, 230 Cal. App. 3d 1525, 1537 (1991), *reh'g denied and opinion modified* (July 2, 1991). In *Aguirre*, the Court of Appeal found that the statute of limitations barred plaintiffs' attempt to add the Fred R. Rippy Trust as a defendant in their Third Amended Complaint where the Trust was a record owner of the two parcels of land contaminated by the other named defendants and where the plaintiffs failed to describe any previous efforts to determine if the trust was responsible for the contamination. 2015 WL 1577323, at *9. The Court reasoned that "[o]nce plaintiffs were on notice of their potential injuries, they were required to 'conduct a reasonable investigation of all potential causes of that injury.'" *Id.* at *8 (citing *Fox v. Ethicon Endo-Surgery*, Inc., 35 Cal. 4th 797, 808 (2005)).

Thus, under California's approach to the delayed discovery rule, it is only once a plaintiff possesses information that would cause a reasonable person to inquire into the cause of their injuries that they are under an obligation to investigate the pertinent facts and the statute of limitations begins to run. Here, Plaintiffs allege that they had no awareness of the risk posed by the toxic vapor

intrusion until May 7, 2015, and they filed suit less than a month later on May 29, 2015. Plaintiffs are entitled to avail themselves of the delayed discovery rule.[2]

### D.   Punitive Damages

Ametek argues that Plaintiffs are not entitled to punitive damages. Am. Mot. 24. Under Cal. Civ. Code. § 3294(a)), punitive damages require proof by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. § 3294(c) in turn provides:

> (1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.
> (2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.
> (3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

Conclusory assertions that a defendant has so acted are not enough: sufficient facts must be alleged to support a request for punitive damages. *Smith v. Superior Court*, 10 Cal. App. 4th 1033, 1042 (1992). Ametek asserts that "[t]here is not a single allegation in the FAC capable of supporting punitive damages." Am. Mot. 25. But as Plaintiffs point out, the Complaint alleges that "Ametek intentionally dumped 1.848 million gallons of toxic waste into a hole in the ground immediately adjacent to an elementary school and residential area" and then "consciously and willfully ignored the state's Cleanup and Abatement Order by not collecting samples to delineate the nature and extent of the toxic plume." Am. Resp. 24–25. In *Smith*, the Court of Appeal ordered plaintiff's prayer for punitive damages struck where the plaintiff's amended complaint alleging defendants failed to represent her property interests in a dissolution proceeding contained no factual assertions supporting a conclusion petitioners acted with oppression, fraud or malice. By contrast, here,

---

[2] Since the Court so rules, the Court need not address Plaintiffs' additional argument that the statute of limitations does not apply because the waste plume constitutes a continuing nuisance. *See* Am. Resp. 18.

Plaintiffs have pled facts that plausibly support their argument that Defendants acted with "willful and conscious disregard of the rights and safety of others." Accordingly, the Court declines to bar Plaintiffs' request for punitive damages at this stage of the litigation.

## III.    Senior Operations' Motion to Dismiss

Senior Operations argues that the case should be dismissed because: (1) the statute of limitation bars Plaintiff Hoy's claims; and (2) Plaintiffs fail to state any claim against Senior. The Court will address each argument in turn.

### A.    Statute of Limitations

First, Senior argues that the statute of limitation bars Plaintiff Hoy's claims because as a teacher at the school, she had reason to suspect the presence of the toxic waste plume due to the "hundreds of publicly available regulatory notices and reports, open meetings of the [Water Board], newspaper articles, television station reports, litigation filings, and continuous air vapor, soil and water testing openly and notoriously conducted in the vicinity of the [Ametek facility], including right inside Magnolia Elementary School classrooms." Sen. Mot. 7.

However, as discussed above in Part II.C, under California's approach to the delayed discovery rule, it is only once a plaintiff possesses information that would cause a reasonable person to inquire into the cause of their injuries that they are under an obligation to investigate the pertinent facts and the statute of limitations begins to run. Here, Plaintiffs allege that they had no awareness of the risk posed by the toxic vapor intrusion until May 7, 2015, and they filed suit less than a month later on May 29, 2015. Even if the Court considers the voluminous filings provided by Defendants, they do not support the proposition that a "reasonable teacher" would have been aware of the risk posed by the waste plume. As Plaintiffs point out, Defendants' filings include numerous previous representations by DTSC and the Cajon Valley School District that the toxic vapor levels in the school "d[id] not pose a significant risk" to human health. Sen. Resp. 8 (citing Am. Mot., Ex. 40; Sen.

Mot., Ex. NN). Thus, even if Plaintiff Hoy had been aware of the testing conducted around the school and these communications, she reasonably could have believed until the May 7, 2015 meeting that the vapor intrusion levels did not yet pose a risk to human health. Accordingly, under the facts alleged, Plaintiff Hoy is entitled to avail herself of the delayed discovery rule.[3]

## B.    Claims against Senior

Senior argues that the case should be dismissed as to Senior because Plaintiffs fail to state any claim against Senior. Sen. Mot. 12. Specifically, they argue that: (1) Plaintiffs do not ascribe any wrongful conduct to Senior; (2) Plaintiffs' nuisance claims are precluded by Cal. Civ. Code § 3482; (3) Plaintiffs fail to plead the essential elements for the negligence and gross negligence claims; and (4) Plaintiffs fail to allege facts supporting an award of punitive damages against Senior.[4] The Court will address each argument in turn.

### i.    Wrongful conduct on the part of Senior

First, Senior argues that Plaintiffs have not specified Senior's wrongful conduct as distinct from Ametek's. Sen. Mot. 13. However, Plaintiffs respond that they specifically alleged that "Senior Operations knows or has known . . . since purchasing the property and aerospace business almost 20 years ago, that DNAPL TCE and other chemicals are continuously contaminating the groundwater and subsurface soil, thereby continuously trespassing and causing a known nuisance to children and teachers at Magnolia," and that "[d]espite such knowledge . . . [Senior] has consciously ignored the danger to the children and teachers." Sen. Resp. 9–10

---

[3] Since the Court did not address Plaintiffs' additional argument that the statute of limitations does not apply because the waste plume constitutes a continuing nuisance, *see* Part II.C fn. 1, the Court also need not address Senior's countering argument that the waste plume should be understood as a permanent nuisance. *See* Sen. Mot. 11–12.

[4] Senior's other arguments have already been addressed in this Order. Senior's argument that Plaintiffs fail to plead compensable injury or loss, Sen. Mot. 16–18, is addressed by Part II.A of this Order rejecting Ametek's argument that Plaintiffs only allege speculative harm. Senior's arguments that Plaintiffs fail to plead the essential elements for public nuisance and strict liability claims, Sen. Mot. 19–22, are addressed by Part II.B.ii–iii of this Order.

(citing Compl. 18–19). These allegations are enough to put Senior on "sufficient notice of the allegations against them." *See Arikat v. JP Morgan Chase & Co.*, 430 F. Supp. 2d 1013, 1020 (N.D. Cal. 2006) (quoting *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988)) (internal quotation mark omitted).

Second, Senior argues that Plaintiffs have not alleged that Senior in any way "create[d] or exacerbate[d]" the contamination. Sen. Mot. 13. Senior relies on *Resolution Trust Corp. V. Rossmoore Corp.*, 34 Cal. App. 4th 93, 99–100 (1995) for the proposition that an "owner of contaminated land is liable for trespass only if it was an active, intentional participant in causing the contamination." Sen. Mot. 13. However, Senior's reliance on *Rossmoore* is misplaced. *Rossmore* found that a defendant lessor was not liable for nuisance or continuing trespass where there was a fuel leak and resulting contamination on a property where the lessor did not have control over the occupation or operation of the premises, but did have a right to reentry, the lessor was not initially aware of the dangerous condition, the lessor acted with ordinary care once they learned of the leaks since they promptly remedied the leaks, and there was no evidence that any failure to act on the part of the lessor caused plaintiff's injury following the occurrence of the leaks. *Rossmore* is inapplicable since here, Plaintiffs have not alleged that Senior is a lessor, but that Senior owned the Ametek facility and had control over it from 1998 onwards. Moreover, unlike in *Rossmore*, here, Plaintiffs allege that Senior was aware of the dangerous condition, and that they did not act with ordinary care once they were aware of the dangerous condition, but instead did nothing to remedy it.

Finally, Senior argues that regulatory documents impose a duty on "Ametek alone" to redress contamination issues, not Senior. Sen. Mot. 13. But Senior cites no authority for the proposition that a regulatory imposition of a duty to remediate on one defendant mitigates another defendant's duties under common law.

### ii.    Cal. Civ. Code § 3482

Senior argues that Plaintiffs' nuisance claims are precluded by Cal. Civ. Code

§ 3482, which provides that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." Sen. Mot. 15. Senior argues that under the Prospective Purchaser Agreement ("PPA") Senior secured from the Water Board, the Water Board "affirm[ed] that this mutual release and covenant not to sue resolves Senior's liability to the Regional Board with regard to any claims related to the matters include in the Prospective Purchaser Agreement and the Resolution" pursuant to **§** 113(f)(2) of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), which provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed to the settlement." Sen. Mot. 15, Ex. H.

As Plaintiffs correctly point out, the PPA by its own terms only released Senior's liability with respect to the Water Board. But even if it did not, the PPA is not a "statute" under the terms of § 3482. As the California Supreme Court observed in *Greater Westchester Homeowners Assn. v. City of Los Angeles*, 26 Cal. 3d 86, 100–01 (1979),

> We have consistently applied a narrow construction to section 3482 and to the principle therein embodied. Thus, a number of years ago we observed, "A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury."

The PPA, a settlement agreement promulgated by a state agency, cannot be understood as a "statute" under this stringent standard.

Senior also argues that "[f]ederal and state law also provide limited immunity from liability for bona fide purchasers like Senior that did not directly cause or contribute to the release of hazardous substances." Sen. Mot. 16 (citing CERCLA, 42 U.S.C. § 9607(r) and the California Land Reuse and Revitalization Act (CLRRA) of 2004, Cal. Health & Safety Code § 25395.81). However, neither

statute is applicable. Even assuming that Senior is a bona fide purchaser, 42 U.S.C. § 9607 provides immunity only from *CERCLA* liability for bona fide purchasers. And § 25395.81 provides immunity for bona fide purchasers only where a release of hazardous materials was characterized, or a response plan was approved pursuant to, Article 6 of the same statute. § 25395.81(1). Senior does not, and could not allege that the PPA was approved pursuant to Article 6 of the same statute, since the CLRRA was only passed in 2004 and the PPA was promulgated in 1998.

### iii.   Negligence and gross negligence

Senior argues that Plaintiffs have not pled the requisite elements for a claim of negligence or gross negligence because they have not alleged facts demonstrating "a duty, breach of that duty, causation, and damages." Sen. Mot. 18. In a toxic tort case, a duty to exercise reasonable care may exist where a defendant has subjected a plaintiff to harm by exposing them to toxic chemicals. *See Miranda*, 17 Cal. App. 4th at 1659; *see also* 1 Toxic Torts Litigation Guide § 2:2.10. Senior cites no cases supporting the proposition that, as a matter of law, they had no duty as the owner of the Ametek Facility from 1998 onwards to exercise reasonable care towards Plaintiffs. The Court finds that, viewing the Complaint in the light most favorable to Plaintiffs, Plaintiffs have alleged facts sufficient to state a plausible claim that Senior Operations had a duty to exercise reasonable care, that Senior breached that duty by "consciously ignor[ing]" the potential danger the toxic waste plume posed to Plaintiffs, and that such a breach caused the increased risk of cancer. Moreover, as discussed above in Part II.A, Plaintiffs adequately plead a damages claim for medical monitoring.

### iv.   Punitive damages

Senior argues that Plaintiffs have failed to allege facts supporting an award of punitive damages against Senior. Sen. Mot. 23. Senior argues that their actions in "defer[ring] to Ametek's cleanup effort" cannot meet the oppression, fraud, or malice standard for punitive damages. *Id.* However, as discussed above in Parts II.D

and III.B.i, Plaintiffs have plausibly alleged that Senior acted with a "willful and conscious disregard of the rights or safety of others" in "consciously ignor[ing]" the danger posed by the toxic waste plume to Plaintiffs. Accordingly, the Court declines to bar Plaintiffs' request for punitive damages at this stage of the litigation.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.   Ametek's Motion to Dismiss (ECF No. 25) is **GRANTED IN PART** and **DENIED IN PART**.

2.   Senior Operations' Motion to Dismiss (ECF No. 24) is **GRANTED IN PART** and **DENIED IN PART**.

3.   Plaintiffs' strict liability (ultrahazardous activity) claim is **DISMISSED** as to all Defendants.

DATED:  November 18, 2015

HON. GONZALO P. CURIEL
United States District Judge